**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LAWRENCE J. KAWECKI,
by JOANNE MARLOWE,
Conservator and Guardian,

      Plaintiff,

                                  Case No. 04-70907
v.                                  Hon. Gerald E. Rosen

COUNTY OF MACOMB, *et al.,*

      Defendants.

_____/

TED BIRKHOLZ, Personal Representative
of the Estate of HELEN ALTON, *et al.,*

      Plaintiffs,

                                  Case No. 05-73498
v.                                  Hon. Gerald E. Rosen

COUNTY OF MACOMB, *et al.,*

      Defendants.

_____/

**OPINION AND ORDER REGARDING DEFENDANTS'**
**RENEWED MOTIONS TO DISMISS OR FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on      January 24, 2008

PRESENT:  Honorable Gerald E. Rosen
                  United States District Judge

**I.  INTRODUCTION**

The two above-captioned suits were commenced in this Court in March of 2004

and September of 2005, respectively, with Plaintiffs alleging, either directly or through personal representatives, that Defendants Macomb County, Macomb County Department of Senior Citizen Services, Naomi Mial, and Mary Nelson-Pulice mismanaged and misappropriated funds belonging to Plaintiffs and held in conservatorships established by the Macomb County Probate Court. Based on these allegations, Plaintiffs have asserted federal due process claims under 42 U.S.C. § 1983 and state-law claims of fraud. Both of these cases have been styled as class actions, with Plaintiffs seeking to represent a class of similarly-situated individuals whose property also has been allegedly mismanaged and misappropriated by Defendants in their collective role as court-appointed conservator.

By opinion and order dated April 29, 2005, the Court found that the first of these two cases, Case Number 04-70907, should be stayed pending the final resolution of parallel state court proceedings in which a court-appointed special fiduciary was investigating allegations of mismanagement of the conservatorship established for Plaintiff Lawrence J. Kawecki. See Kawecki v. County of Macomb, 367 F. Supp.2d 1137 (E.D. Mich. 2005). In an accompanying order imposing a stay, the Court instructed counsel for the parties to file joint statements at six-month intervals advising of the status of the state court proceedings. However, no such statements have ever been filed by any party.[1] Instead, the parties have filed a number of motions, with Plaintiff requesting leave

---

[1]In a separate order regarding Plaintiffs' recently filed motion for recusal, the Court addresses in some detail the implications of counsels' failure to adhere to this aspect of the April 29, 2005 stay order.

to commence discovery and Defendants seeking dismissal or an award of summary judgment in their favor.  In addition, Plaintiff's counsel commenced the second of these two actions, Case Number 05-73498, on behalf of three additional Plaintiffs (as well as a purported class of similarly-situated individuals), without indicating in the pleadings in this second suit whether there were pending state court proceedings that this Court would likely view as parallel in light of its ruling in Case Number 04-70907.

Despite the parties' failure to provide periodic status reports as instructed, it appears from their more recent submissions and accompanying exhibits that all such parallel state court proceedings have now concluded.  In particular, in initial and renewed motions filed in April of 2006 and March of 2007, Defendants cite the resolution of these state court proceedings as grounds for the dismissal of Plaintiffs' two federal cases or an award of summary judgment in Defendants' favor, arguing that the doctrines of issue and claim preclusion defeat Plaintiffs' entitlement to any further relief in this Court.  In addition, Defendants contend that Plaintiffs' federal due process claims suffer from other legal defects that preclude any recovery in these cases.

Defendants' motions have been fully briefed by the parties in both cases.  Having reviewed the parties' briefs in support of and opposition to these motions, the accompanying exhibits, and the record as a whole, the Court finds that the pertinent facts, allegations, and legal issues are presented with sufficient clarity in these written submissions, and that oral argument would not assist in the resolution of these motions.  Accordingly, the Court will decide Defendants' motions "on the briefs."  See Local Rule

7.1(e)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings.

## II. FACTUAL AND PROCEDURAL BACKGROUND

For present purposes, the record presented by the parties is quite limited, and consists almost exclusively of (i) Plaintiffs' allegations in the two complaints and (ii) various petitions, orders, and hearing transcripts from the related state court proceedings. To the extent that the parties dispute any of the facts or allegations set forth in these materials, the Court accepts the allegations of Plaintiffs' two complaints as true, and views the remainder of the record in a light most favorable to Plaintiffs as the non-moving parties.

**A.      The State Court Proceedings on Behalf of Plaintiff Lawrence J. Kawecki**

On or around January 23, 2003, a conservatorship was established for Plaintiff Lawrence J. Kawecki in the Macomb County Probate Court, and Defendant Macomb County Department of Senior Citizen Services ("MCDSCS") was appointed as the conservator.[2] Letters of conservatorship subsequently were issued authorizing Defendant Naomi Mial, who was employed at the time as a case manager for the MCDSCS, to conduct financial business on behalf of Plaintiff and his conservatorship.[3]

---

[2]This conservatorship apparently was established as a result of Plaintiff's mental incapacitation. At around the same time, a conservatorship also was established for Lawrence R. Kawecki, Plaintiff's father, and MCDSCS again was appointed as conservator. Both Plaintiff and his father have since passed away.

[3]In the Kawecki case, Defendant Mial is represented by counsel — albeit not the same attorneys who are representing the remaining Defendants — and has filed an answer to the

4

Plaintiff Kawecki alleges in his complaint that between November of 2002 and

March of 2003, Defendants Mary Nelson-Pulice and Naomi Mial misappropriated his

funds in their roles as employees and agents of the court-appointed conservator, the

MCDSCS. As evidence of this misappropriation, the complaint cites a March 1, 2004

report by Donald M. Strehl, who was appointed by the Macomb County Probate Court to

serve as a "special fiduciary" and charged with the task of investigating allegations of

mismanagement of Plaintiff's conservatorship account.[4] In this report, Strehl noted his

concerns that (i) that personal property was sold without any evidence as to its value; (ii)

that family members had complained that very expensive collectibles, jewelry, and coin

collections had gone missing without any commensurate return to Plaintiff's

_____

complaint. Her counsel has moved to withdraw, however, citing a retention agreement in which
Defendant Macomb County agreed to provide counsel for Mial subject to a reservation of rights
in the event it was determined that she had acted outside the scope of her employment. Mial's
counsel asserts that this condition for withdrawal has been triggered by a criminal investigation
into allegations that Mial misappropriated funds from the conservatorships of Plaintiff Kawecki
and other individuals. This investigation resulted in several felony charges against Mial, and she
apparently has pled guilty to one or more of these charges.

     In the more recently filed Birkholz suit, Defendant Mial evidently has been served with
the complaint, but has not yet appeared or filed an answer to the complaint. However, Plaintiffs
have yet to pursue a clerk's entry of default or default judgment against Mial.

     [4]According to probate court documents attached as exhibits to Defendants' current and
prior motions in Kawecki, on the same date in November of 2003 that Strehl was appointed as
special fiduciary of Plaintiff's conservatorship, he also was appointed as special fiduciary of the
estate of Plaintiff's father, Lawrence R. Kawecki. Strehl issued March 1, 2004 reports in both
cases, and his report about possible mismanagement of Plaintiff's conservatorship account
incorporated by reference the report he issued pursuant to his investigation of the alleged
mismanagement of the estate of Plaintiff's father. Strehl also observed in his report that assets
apparently were transferred from Plaintiff's father's estate to Plaintiff's conservatorship account,
but without appropriate documentation of these transfers.

conservatorship account; (iii) that there was no documentary support for certain expenditures; (iv) that title to a car apparently owned by Plaintiff or his father was transferred to a relative of Defendant Mial for the sum of $500; and ( v) that various suspect checks had been written using estate funds. (See Kawecki Complaint at ¶ 18.) Strehl concluded his brief report by recommending further investigation and possible surcharge of Defendant MCDSCS.

Within a few days after the special fiduciary issued this March 1, 2004 report, Plaintiff Kawecki commenced Case Number 04-70907 in this Court, asserting federal due process claims under 42 U.S.C. § 1983 and state-law claims of fraud. These claims rest solely upon the above-cited allegations that funds belonging to Plaintiff were misappropriated by the MCDSCS, through its employees Mial and Nelson-Pulice, in the agency's role as court-appointed conservator.[5] Defendants moved to dismiss this suit on a number of grounds, and the Court granted this motion in part in an April 29, 2005 opinion and order, finding that the case should be stayed pending the outcome of the proceedings being pursued by the special fiduciary before the Macomb County Probate Court. See Kawecki, 367 F. Supp.2d at 1144-50.

While this federal suit remained stayed, special fiduciary Strehl continued his investigation, issuing subpoenas to various banks and other third parties in an effort to

---

[5]As noted earlier, Plaintiff brought this suit as a putative class action, seeking to have his personal representative, Joanne Marlowe, named as the representative of a class of individuals who have been similarly victimized by Defendants' alleged mismanagement or misappropriation of client funds entrusted to the MCDSCS in its role as court-appointed conservator.

obtain further details about the suspect transactions identified in his initial report. At the conclusion of this investigation, Strehl filed a petition for surcharge of the MCDSCS, seeking reimbursement for losses incurred by the estates of Plaintiff and his father during the period that the MCDSCS served as conservator.

The Macomb County Probate Court held three hearings on the special fiduciary's petition for surcharge and related matters. At the first, held on February 25, 2005, special fiduciary Strehl advised the court that he had reached a proposed settlement with Macomb County and the MCDSCS, under which the MCDSCS agreed to pay $31,831.20 to the estates of Plaintiff and his father and $10,972.50 to Strehl in special fiduciary fees. Strehl further stated his belief that this proposed settlement was in the best interests of the estates, and he asked the court to set a hearing for approval of this settlement. The court then heard from attorney Annette Baker, counsel for Plaintiff's estate,[6] who raised two objections to the proposed settlement. First, Ms. Baker indicated that an accountant had been hired to ensure that all of Plaintiff's and his father's bank accounts had been identified and accounted for, and she asked that no settlement be approved until the accountant had concluded his investigation. Next, Ms. Baker objected that the $8,500 figure included in the proposed settlement as reimbursement for lost or misappropriated

---

[6]Ms. Baker also represents Plaintiff in the federal suit, along with several other attorneys. One of these attorneys, Donna MacKenzie, also attended the February 25, 2005 probate court hearing on behalf of Joanne Marlowe, Plaintiff's personal representative in the federal suit. In addition, another of Plaintiff Kawecki's attorneys in the federal suit, Jules Olsman, entered his appearance on behalf of Joanne Marlowe in the probate court proceedings, but it does not appear that Mr. Olsman attended any of the probate court hearings.

personal property was "way under value." (2/25/2005 Hearing Tr. at 9.) The court

acknowledged these objections, and promised to address them at the forthcoming hearing

for approval of the settlement.

On May 4, 2005, the parties again appeared before the Macomb County Probate

Court to address any remaining objections to the proposed settlement reached between the

special fiduciary and the county. Ms. Baker again spoke on behalf of Plaintiff's estate,

updating the court as to the status of the objections she had raised at the February 25

hearing. First, she advised the court that additional bank accounts held by Plaintiff and

his father had been identified, and that the special fiduciary had successfully retrieved the

funds from these accounts and filed the necessary tax returns. Thus, Ms. Baker

concluded that "[w]e have found everything that we believe is locatable at this time."

(5/4/2005 Hearing Tr. at 5.) The court then inquired about Ms. Baker's other objection

— namely, that the proposed settlement did not adequately compensate Plaintiff's estate

for the loss or misappropriation of personal property:

> THE COURT: What about the issue of the personal property, I
> believe that was another objection, was a value to be placed on that
> property.
>
> MS. BAKER: I still believe the value of the personal property is
> low, I think it only represents probably 25 percent of the appraised value
> which I think is low, but how much do I want to argue about that, that is —
>
> THE COURT: So, that is no longer an objection you wish to pursue
> on that issue?
>
> MS. BAKER: That is correct.

(Id.)[7]

The remainder of the May 4, 2005 hearing was devoted to the issue of which of two proposed orders the court should enter. Ms. Baker urged the court to enter the order submitted by special fiduciary Strehl, which provided generally that the court had conducted a hearing for approval of the settlement placed on the record on February 25, 2005, and that, in accordance with that settlement, the MCDSCS was directed to pay $31,831.20 to the estates of Plaintiff and his father and $10,972.50 in fees to the special fiduciary "in full resolution and satisfaction of the Special Fiduciary's Petition for Surcharge." (Defendants' Renewed Motion, Ex. F, Proposed Consent Order.) Macomb County's attorneys, in contrast, sought the entry of an order that stated in addition:

> THIS IS A FINAL ORDER AND CLOSES ALL OUTSTANDING
> ISSUES AND DISPUTES IN THIS MATTER AS THEY PERTAIN TO
> MACOMB COUNTY, THE MCDSCS, AND ITS AGENTS AND
> EMPLOYEES. THIS COURT SHALL RETAIN JURISDICTION.

(Defendants' Renewed Motion, Ex. H, Order for Surcharge.) Ms. Baker "object[ed] very strenuously" to the entry of the order submitted by the county, opining that its additional language might be construed as jeopardizing Plaintiff's opportunity to pursue his federal constitutional claims that remained pending before this Court. (5/4/2005 Hearing Tr. at 6, 8, 14.) The probate court took the matter under advisement, inviting the parties to file supplemental briefs and stating that it would enter one of the two proposed orders after

---

[7]Later, near the conclusion of the hearing, Ms. Baker reiterated that her objections to the petition for surcharge had been "resolved." (Id. at 26.)

reviewing the parties' submissions and this Court's April 29, 2005 opinion and order.

On May 19, 2005, the Macomb County Probate Court entered the order for surcharge submitted by the county. Because this order had not been circulated among the interested parties in advance of the May 4, 2005 hearing, the special fiduciary determined that another hearing should be convened to provide one final opportunity for these parties to object to the entry of this order. Ms. Baker once again appeared on behalf of Plaintiff's estate at this June 15, 2005 hearing, stating that "under no circumstances are we prepared to assert [Plaintiff's] . . . federal constitutional claims in these surcharge proceedings," and objecting that the order entered by the court threatened to "depriv[e] [Plaintiff] of his federal constitutional claims" that he had elected to assert and pursue in federal court. (6/15/2005 Hearing Tr. at 7-8.) Moreover, in light of the probate court's entry of an order that she viewed as overly broad, Ms. Baker sought to reassert her objection to the settlement reached between the special fiduciary and the county, questioning whether it "reflect[ed] the appropriate measure of damages" and requesting that the court "order that a forensic accountant be hired to investigate" the MCDSCS's handling of Plaintiff's estate. (Id. at 8.)

The probate court declined to order any further proceedings or investigations, however, finding that Ms. Baker had an adequate opportunity at the past and present hearings to identify reasons why the court should not approve the settlement reached between the special fiduciary and the county. The court observed, for instance, that it had granted Ms. Baker's earlier request for additional time so that an accountant could review

Plaintiff's accounts and identify any discrepancies, and it noted Ms. Baker's statement at the May 4, 2005 hearing that she no longer wished to pursue any objections to the amount of the proposed settlement. Moreover, when the court once again invited Ms. Baker to offer any additional information or evidence bearing upon the adequacy of the settlement, she declined to do so, stating that she viewed this as tantamount to asking the probate court to "address . . . constitutional issues" that Plaintiff wished to reserve for federal court. (6/15/2005 Hearing Tr. at 21-24.) Under these circumstances, the court determined that it had provided sufficient time and opportunity for the parties to produce "evidence . . . in regards to the appropriateness of the settlement," that it would not be "appropriate . . . to grant any more time" to address this matter, and that it instead was time for the matter to "come to conclusion in this court." (Id. at 29.)

At the conclusion of the June 15, 2005 hearing, the probate court entered an order reaffirming that its "May 19, 2005, order continues to represent the order of this Court." (Defendants' Renewed Motion, Ex. K, 6/15/2005 Order at 1.) This order then stated:

> IT IS FURTHER ORDERED that the objections of the heirs who seek to oppose the settlement arranged between the Special Fiduciary and the County of Macomb shall be and hereby are OVERRULED as there is no evidence adduced by the Objecting Heirs that [t]he sums proposed by the County of Macomb and accepted by the Special Fiduciary are in anyway inadequate and that, based upon the evidence adduced at the previous approval hearing of this Court and on June 15, 2005, the amounts appear to be a complete replacement of any sums allegedly missing in the above-captioned estate.

(Id. at 1-2.) So far as the record reveals, no appeal has been taken from this or any other order issued by the Macomb County Probate Court with regard to Plaintiff's or his

father's conservatorship.  Rather, it appears that all such state court proceedings have come to an end.

**B.      The State Court Proceedings on Behalf of Plaintiff Helen Alton**

According to the complaint in <u>Birkholz</u>, Case Number 05-73498, a conservatorship was established for Plaintiff Helen Alton on or around September 9, 2002, and the MCDSCS was appointed as the conservator.  Letters of conservatorship subsequently were issued authorizing Defendants Mial and Nelson-Pulice to conduct financial business on behalf of Plaintiff Alton and her conservatorship.  Plaintiff Alton, through her personal representative Ted Birkholz, alleges in the complaint that during the time period when the MCDSCS served as conservator, agency employees Nelson-Pulice and Mial misappropriated her funds in violation of federal and state law.[8]

The record indicates that attorney Russell LaBarge, Jr. was appointed by the Macomb County Probate Court to serve as a special fiduciary and investigate these allegations of misappropriation.  In letters sent to the court in January and March of 2004, LaBarge reported (i) that the proceeds of a garage sale of the contents of Plaintiff Alton's home were unaccounted for, (ii) that cash and certain personal property items belonging to Plaintiff also were missing and unaccounted for, and (iii) that certain disbursements from Plaintiff's bank accounts could not yet be explained.  Beyond these issues identified in LaBarge's two letters, the record does not indicate the extent of the special fiduciary's

---

[8]It appears from the record that Ms. Alton, like Mr. Kawecki, has passed away, and the complaint identifies Ted Birkholz as the personal representative of Ms. Alton's estate.

12

investigation or the specific conclusions he reached as a result.

In July of 2005, special fiduciary LaBarge, personal representative Birkholz, and counsel for Macomb County and the MCDSCS entered into a stipulation calling for the county to "be surcharged and pay $2,500.00 to the Estate of Helen Alton." (Defendants' Renewed Motion in Case Number 05-73498, Ex. G, Stipulation and Order for Surcharge at 2.)[9] According to the stipulation, this agreement rested upon the special fiduciary's production of documentation reflecting "questionable actions and disbursements by MCDSCS and its agents in their capacity as prior Conservator." (Id.) This stipulation further recited that "the Special Fiduciary, upon receipt of the payment [of $2,500] to the Estate of Helen Alton, releases all claims the conservatorship has against the County of Macomb and/or their agents, concerning conservatorship assets and the handling of such assets by the County of Macomb and/or their agents." (Id.)[10]

On August 10, 2005, the Macomb County Probate Court entered an order for surcharge of the MCDSCS pursuant to the above-cited stipulation of the parties. This order, like the stipulation, provided that the special fiduciary had "release[d] all claims the conservatorship has concerning conservatorship assets and the handling of such assets

---

[9]This stipulation further called for the County to pay special fiduciary fees to LaBarge in the amount of $4,055.

[10]Along with this stipulation, Defendants have produced correspondence sent by personal representative Ted Birkholz to counsel for the MCDSCS in June of 2005, in which Birkholz states his agreement with the restitution amount of $2,500 proposed by the special fiduciary and expresses his willingness to sign papers reflecting this agreement. (See Defendants' Renewed Motion, Ex. H.)

by the County of Macomb and/or their agents." (Defendants' Renewed Motion, Ex. G, Order for Surcharge at 2.) This order also included language similar to that sought and obtained by the MCDSCS in the <u>Kawecki</u> proceedings, stating that "THIS IS A FINAL ORDER AND CLOSES ALL ISSUES REGARDING SURCHARGES AGAINST THE MCDSCS AND/OR MACOMB COUNTY." (<u>Id.</u> at 3.)[11] So far as the record reveals, no appeal has been taken from this or any other order entered by the probate court with regard to the conservatorship established for Plaintiff Alton.

**C.    The State Court Proceedings Regarding Plaintiff Martha Pridemore**

According to the <u>Birkholz</u> complaint, a conservatorship was established for Plaintiff Martha Pridemore on or around January 22, 2002, and the MCDSCS was appointed as the conservator. Letters of conservatorship subsequently were issued authorizing Defendants Mial and Nelson-Pulice to conduct financial business on behalf of Plaintiff Pridemore. Plaintiff alleges in the complaint that during the time period when the MCDSCS served as conservator, agency employees Nelson-Pulice and Mial misappropriated her funds in violation of federal and state law.

The record indicates that the firm of ADDMS Guardianship Svc., Inc., and its president, Alan F. Polack, were appointed as successor conservators of the estate of Plaintiff Pridemore, and were charged with the task of investigating allegations that the MCDSCS misappropriated assets or mishandled the conservatorship in its role as

---

[11]On the same date that this order was entered, the probate court also entered an order allowing the final account of the MCDSCS as conservator of Plaintiff Alton's estate.

conservator.  According to a stipulation entered into between the MCDSCS and the

successor conservators, however, Polack's investigation revealed "no wrongdoing" in the

MCDSCS's handling of the conservatorship.  (Defendants' Renewed Motion, Ex. I,

Stipulation Closing Investigation at 2.)  Consequently, the successor conservators agreed

in the stipulation to close their investigation and "release all claims the conservatorship

has concerning conservatorship assets and the handling of such assets by the County of

Macomb and/or its agents." (Id.)  The Macomb County Probate Court, in turn, entered a

June 7, 2005 order pursuant to this stipulation in which it approved the closing of the

investigation and the successor conservators' release of all claims arising from the

MCDSCS's actions as conservator.  (Defendants' Renewed Motion, Ex. I, Order Closing

Investigation).[12]  Again, it does not appear that any appeal has been taken from this order.

**D.     The State Court Proceedings Regarding Plaintiff Jacob Schwartzkopf**

According to the Birkholz complaint, a conservatorship was established for

Plaintiff Jacob Schwartzkopf on or around September 10, 2002, and the MCDSCS was

appointed as the conservator.  Letters of conservatorship then were issued authorizing

Defendants Mial and Nelson-Pulice to conduct financial business on behalf of Plaintiff

Schwartzkopf.  Plaintiff Schwartzkopf, through his personal representative Cindy

Schwartzkopf, alleges in the complaint that during the time period when the MCDSCS

---

[12]This order, once again, included language stating that it was "A FINAL ORDER AND
CLOSES ALL ISSUES REGARDING SURCHARGES AGAINST THE MCDSCS AND/OR
MACOMB COUNTY IN THIS MATTER." (Id. at 3.)

served as conservator, agency employees Nelson-Pulice and Mial misappropriated his funds in violation of federal and state law.

The record indicates that attorney Russell LaBarge, Jr. was appointed by the Macomb County Probate Court to serve as a special fiduciary and investigate these allegations of misappropriation. In early 2005, LaBarge and the MCDSCS filed a stipulation with the probate court indicating that the special fiduciary's investigation had failed to reveal any wrongdoing in the MCDSCS's handling of Plaintiff's conservatorship. Accordingly, by petition filed in May of 2005, the MCDSCS sought the entry of an order closing special fiduciary LaBarge's investigation and releasing all claims that LaBarge, as successor conservator, might have against Macomb County or its agents regarding the actions taken by the MCDSCS as conservator.

On August 26, 2005, Plaintiff's personal representative, Cindy Schwartzkopf, filed objections to the petition filed by the MCDSCS, identifying ten categories of assets which she alleged had been taken from Plaintiff's estate or were otherwise unaccounted for in the transition from the MCDSCS to Russell LaBarge as successor conservator.[13] After stating these objections, Ms. Schwartzkopf requested "a complete evidentiary hearing and an accounting regarding the missing property." (Plaintiff Schwartzkopf's 7/31/2006 Emergency Motion to Stay Proceedings, Ex. 2, Objections at 2.) In light of this request,

_____

[13]Ms. Schwartzkopf filed these objections through an attorney, Dolora Paull, who continued to represent her throughout the subsequent probate court proceedings, but who has not appeared in the federal suit.

the probate court entered a stipulated order adjourning the hearing on the MCDSCS's

petition and Ms. Schwartzkopf's objections in order to allow for a period of discovery.[14]

Over a year later, on October 12 and 15, 2006, the Macomb County Probate Court

held a bench trial on the MCDSCS's petition and Ms. Schwartzkopf's objections, with the

parties presenting "substantial testimony and evidence" for the court's consideration.

(Defendants' Renewed Motion in Case Number 05-73498, Ex. C, 11/2/2006 Hearing Tr.

at 3.)[15]  At the outset of this two-day trial, Ms. Schwartzkopf withdrew six of her

objections.  Several other objections were resolved at the close of Ms. Schwartzkopf's

proofs when the probate court entered a directed verdict against her.  As to these

objections, the court explained in a corresponding order that Ms. Schwartzkopf had

"wholly failed to prove the existence of the alleged property or failed to prove any

wrongdoing, including theft, fraud, negligence, misfeasance, malfeasance, etc., by the

[MCDSCS] in the handling of" the assets identified in these objections.  (Defendants'

Renewed Motion, Ex. D, Order of Directed Verdict at 1.)

The probate court then ruled upon Ms. Schwartzkopf's remaining objections at a

November 2, 2006 hearing.  Citing issues relating to Ms. Schwartzkopf's credibility as a

---

[14]Although this stipulated order of adjournment is not in the record, Plaintiff
Schwartzkopf referred to it in a July 31, 2006 emergency motion that is addressed below.

[15]Shortly before this trial was scheduled to begin, Ms. Schwartzkopf filed a July 31, 2006
emergency motion in this Court, requesting that the probate court proceedings be enjoined as a
threat to a posited "constitutional right" to have Plaintiff's federal claims addressed in his chosen
federal forum.  The Court denied this motion in an order dated September 12, 2006, citing the
Supreme Court's repeated rejection of the notion that a federal court plaintiff has any such
"right" to insist his federal claims be litigated exclusively in federal court.

witness, her unexplained delay in raising objections to the MCDSCS's handling of certain assets, and inconsistencies in the evidence, the probate court found that Ms. Schwartzkopf "simply did not meet her burden of proof to convince this trier of fact that a loss to the estate did, in fact, occur or that if it did occur, that the loss is attributable to behavior of [the MCDSCS]." (11/2/2006 Hearing Tr. at 5-8.) The court observed that Ms. Schwartzkopf "sought to rely largely on the fact that Naomi Mial had misappropriated assets in other files," but found that this was "simply insufficient to establish that she has done so in connection with this estate." (Id. at 8.)

Accordingly, the court overruled Ms. Schwartzkopf's objections, (id. at 9), and entered a judgment that same day reflecting this ruling, (see Defendants' Renewed Motion, Ex. D, Judgment on Hearing on Objections). In this judgment, the court sustained the special fiduciary's finding "that no misconduct can be shown against . . . Macomb County and MCDSCS," and concluded that "there is no liability on the part of [the County and the MCDSCS] with respect to claimed property losses or expropriation of [Plaintiff Schwartzkopf's] property as allegedly taken improperly by [the County and the MCDSCS]." (Id. at 2.) The judgment further provided that "[t]his Order disposes [of] the last pending claim and closes the case," with the exception of an issue of mediation sanctions that the court reserved for a later decision. (Id.)[16] Finally, in a

---

[16]A significant portion of the November 2 hearing was devoted to a discussion whether the court's judgment should include additional language sought by the MCDSCS, stating that Ms. Schwartzkopf had been "given the additional opportunity to present any and all claims, including any federal constitutional claims and/or suits pursuant to 42 [U.S.C.] 1983," but that she had "declined to proceed with" any such claims. The court was unwilling to include this

second order entered on November 2, 2006, the probate court closed Plaintiff

Schwartzkopf's estate and discharged the MCDSCS from any further duties as

conservator.  There is no evidence of any appeal from the probate court's orders.

## III. ANALYSIS

### A.    The Standards Governing Defendants' Motions

Through their initial and renewed motions in the two above-captioned cases,

Defendants have moved for the dismissal of Plaintiffs' claims pursuant to Fed. R. Civ. P.

12(b)(6) or an award of summary judgment in their favor pursuant to Fed. R. Civ. P. 56.

Because the Court has reviewed and considered materials outside the pleadings in

resolving Defendants' motions, they will be treated as seeking summary judgment under

Rule 56.  See Fed. R. Civ. P. 12(b).[17]

---

provision in its judgment, reasoning that it had "only address[ed] issues of a probate matter,"and explaining that the proceedings had resulted only in "the Court . . . closing the investigation . . . [and] allowing the accounting which eliminates the opportunity to raise any further objections." (11/2/2006 Hearing Tr. at 11, 14.)  Accordingly, the Court substituted standard language from the Michigan Court Rules stating that the judgment "resolves the last pending claim and closes the case," and Ms. Schwartzkopf's counsel expressed her concurrence with the court's proposed language.  (Id. at 15-16.)

[17]Arguably, Defendants' motions could still be analyzed under Rule 12(b)(6), because the materials outside the pleadings that the Court has considered consist entirely of petitions, orders, and transcripts from the state court proceedings.  See Rodic v. Thistledown Racing Club, Inc., 615 F.2d 736, 738 (6th Cir. 1980) ("Federal courts may take judicial notice of proceedings in other courts of record." (internal quotation marks and citation omitted)); see also Cleveland Industrial Square, Inc. v. White, 52 F.3d 324, 1995 WL 154912, at *4 (6th Cir. Apr. 6, 1995). Yet, even if the Court's review of these materials dictates that Defendants' motions be resolved under the standards of Rule 56, such treatment is permissible so long as the parties are given a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b).

Because Defendants brought their motions under both Rule 12(b)(6) and Rule 56, there is

Under Rule 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As noted, the parties are largely in agreement as to the pertinent facts — namely, the events that transpired and the orders that were issued in the related state court proceedings — but disagree as to the legal significance of these developments.  Consequently, the disposition of Defendants' motions turns purely upon these questions of law, to which the Court now turns.

**B.     Plaintiffs' Federal § 1983 Claims Are Defeated by the State Probate Court's Determinations of the Property Losses, If Any, They Suffered as a Result of the MCDSCS's Actions as Conservator.**

As the principal ground for seeking an award of summary judgment in their favor in each of the two above-captioned cases, Defendants argue that Plaintiffs are precluded by the doctrines of *res judicata* and collateral estoppel from continuing to pursue their

---

no concern in these cases that Plaintiffs might be unfairly surprised or prejudiced by the Court's election to resolve these motions by reference to the standards of the latter Rule.  Indeed, it seems evident from Plaintiffs' responses to Defendants' motions that they have no quarrel with the extrinsic materials accompanying these motions, but instead view the issues raised by Defendants as purely legal in nature.  In particular, Plaintiffs have filed single consolidated responses to Defendants' initial and renewed motions in the two cases, these responses are unaccompanied by any exhibits, and the arguments advanced in Plaintiffs' briefs do not turn upon factual disputes about what transpired in the state court proceedings.  So far as may be gleaned from Plaintiffs' submissions, all four Plaintiffs stand on precisely the same legal footing in these federal suits, without regard for any specific developments in or distinctions among their individual state court proceedings.  Under these circumstances, the Court is confident that Plaintiffs received sufficient notice that Defendants' motion might be addressed under the standards of Rule 56, as well as ample opportunity to provide any materials that they might have thought relevant to the Court's analysis under that Rule.  See Song v. City of Elyria, 985 F.2d 840, 842 (6th Cir. 1993).

federal § 1983 claims before this Court, where Plaintiffs purportedly could have asserted these claims in the state probate court proceedings but failed to do so, and where the issues actually and necessarily decided in the course of the state court proceedings defeat Plaintiffs' ability to seek any further relief under § 1983. In response, Plaintiffs deny that the state court proceedings have any such preclusive effect here, where their federal claims purportedly turn upon issues that were not presented to or decided by the probate court, and where the state court surcharge proceedings did not provide an adequate opportunity for litigation of these claims. While the Court is reluctant to accept Defendants' broadest view of the *res judicata* effect of the state court proceedings, it agrees with Defendants' more limited contention that the actual rulings in those proceedings operate to preclude any further award of relief to Plaintiffs under § 1983.

The federal Full Faith and Credit Act mandates that state court proceedings and records "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." 28 U.S.C. § 1738. "This statute has long been understood to encompass the doctrines of res judicata, or 'claim preclusion,' and collateral estoppel, or 'issue preclusion.'" San Remo Hotel, L.P. v. City & County of San Francisco, 545 U.S. 323, 336, 125 S. Ct. 2491, 2500 (2005).[18] The Act reflects and implements the "general rule" that "parties should

_____

[18]The Supreme Court has explained:

Under res judicata [or claim preclusion], a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Under collateral estoppel [or issue

21

not be permitted to relitigate issues that have been resolved by courts of competent jurisdiction." San Remo Hotel, 545 U.S. at 336, 125 S. Ct. at 2501. As is evident from the statute itself, the preclusive effect of a state court ruling is determined by resort to that state's law of claim and issue preclusion. See Darrah v. City of Oak Park, 255 F.3d 301, 311 (6th Cir. 2001). In this case, then, the Court must look to Michigan law in determining whether, and to what extent, the orders and rulings of the Macomb County Probate Court preclude Plaintiffs from going forward with their federal § 1983 claims.

1.    **The Preclusive Effect of the State Court's Rulings Is Not Diminished by Plaintiffs' Purported Refusal to Litigate Issues That Were Necessary to the State Court's Resolution of the Matters Before It.**

In a threshold attempt to short-circuit the Court's inquiry into issue and claim preclusion, Plaintiffs broadly assert that they could (and did) avoid any such preclusive effect by "refus[ing] to litigate" one or more of the issues upon which their federal claims depend. As presaged by the Court's September 12, 2006 order in Birkholz denying Cindy Schwartzkopf's motion to stay the state court proceedings regarding the estate of Plaintiff Jacob Schwartzkopf, the Court readily rejects the notion that a federal court plaintiff has an inviolate right to pursue his or her federal claims in a preferred federal forum, such that this party may freely pick and choose among the issues to litigate in state court

---

preclusion], once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.

San Remo Hotel, 545 U.S. at 336 n.16, 125 S. Ct. at 2500 n.16 (internal quotation marks and citation omitted).

without fear of any resulting preclusive effect upon his or her federal claims.  Such a posited right is flatly inconsistent with Supreme Court precedent addressing the preclusive effect of state court rulings upon § 1983 claims brought in federal court.

Two Supreme Court decisions are particularly instructive on this point.  The first of these cases, Allen v. McCurry, 449 U.S. 90, 101 S. Ct. 411 (1980), arose when plaintiff Willie McCurry brought suit in federal court under 42 U.S.C. § 1983, alleging that the defendant police officers had violated his Fourth Amendment protection against unreasonable searches and seizures.  Prior to this federal suit, McCurry had been charged with drug possession and assault in state court criminal proceedings, and had raised essentially the same Fourth Amendment challenge in a pretrial motion to suppress.  The state court denied this motion in part, and McCurry subsequently was convicted of both state-law offenses.

In the ensuing federal § 1983 action, the district court held that McCurry was precluded by principles of collateral estoppel from relitigating the search-and-seizure issues decided against him in the state court criminal proceedings.  The court of appeals reversed this ruling and remanded the case for trial, "invoking the special role of the federal courts in protecting civil rights" and reasoning that "the § 1983 suit was McCurry's only route to a federal forum for his constitutional claim."  Allen, 449 U.S. at 93-94, 101 S. Ct. at 414 (internal quotation marks and citation omitted).

The Supreme Court reversed, holding that the doctrine of collateral estoppel is applicable in § 1983 suits.  In so ruling, the Court stated:

The actual basis of the Court of Appeals' holding appears to be a generally framed principle that every person asserting a federal right is entitled to one unencumbered opportunity to litigate that right in a federal district court, regardless of the legal posture in which the federal claim arises. But the authority for this principle is difficult to discern. It cannot lie in the Constitution, which makes no such guarantee, but leaves the scope of the jurisdiction of the federal district courts to the wisdom of Congress. And no such authority is to be found in § 1983 itself. For reasons already discussed at length, nothing in the language or legislative history of § 1983 proves any congressional intent to deny binding effect to a state-court judgment or decision when the state court, acting within its proper jurisdiction, has given the parties a full and fair opportunity to litigate federal claims, and thereby has shown itself willing and able to protect federal rights . . . . There is, in short, no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all.

449 U.S. at 103-04, 101 S. Ct. at 419-20 (footnotes omitted).

The Supreme Court revisited this issue in its recent San Remo Hotel decision. While the plaintiff in Allen had himself raised in state court the issue of federal law that he then sought to relitigate in his federal § 1983 suit, the plaintiffs in San Remo Hotel made no such election. Rather, the plaintiffs in the latter case had initially asserted their federal § 1983 claims — specifically, Fifth Amendment takings claims, as well as substantive and procedural due process claims — in federal court, but were compelled under federal ripeness principles to seek adequate compensation in state court before they could return to federal court and pursue their takings claims. Under these circumstances, the plaintiffs argued that the federal court should not be bound by the state court's rulings in the course of the proceedings to determine just compensation, "in order to ensure that

24

federal takings claims can be considered on the merits in federal court."  San Remo Hotel,

545 U.S. at 338, 125 S. Ct. at 2501 (internal quotation marks, alteration, and citation

omitted).

The Supreme Court disagreed.  In confirming that litigants in Fifth Amendment

takings cases are bound by the usual preclusion principles, the Court returned to, and

again rejected, the proposition it had considered in Allen — namely, "that plaintiffs have

a right to vindicate their federal claims in a federal forum."  San Remo Hotel, 545 U.S. at

342, 125 S. Ct. at 2504.  The Court explained:

> We have repeatedly held, to the contrary, that issues actually decided in
> valid state-court judgments may well deprive plaintiffs of the "right" to
> have their federal claims relitigated in federal court.  *See, e.g., Migra v.
> Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 84, 104 S.Ct. 892, 79
> L.Ed.2d 56 (1984); *Allen,* 449 U.S., at 103-104, 101 S.Ct. 411.  This is so
> even when the plaintiff would have preferred not to litigate in state court,
> but was required to do so by statute or prudential rules.  See *id.,* at 104, 101
> S.Ct. 411.  The relevant question in such cases is not whether the plaintiff
> has been afforded access to a federal forum; rather, the question is whether
> the state court actually decided an issue of fact or law that was necessary to
> its judgment.
>
> * * * *
>
> As in *Allen,* we are presently concerned only with issues *actually
> decided* by the state court that are dispositive of federal claims raised under
> § 1983.  And, also as in *Allen,* it is clear that [the plaintiffs] would have
> preferred not to have been forced to have their federal claims resolved by
> issues decided in state court.  Unfortunately for [the plaintiffs], it is entirely
> *unclear* why their preference for a federal forum should matter for
> constitutional or statutory purposes.

545 U.S. at 342-44, 125 S. Ct. at 2504-05.

The Court then concluded that such considerations as a litigant's preference for

federal court or the involuntariness of his or her participation in related state court

proceedings did not warrant a deviation from the preclusion principles mandated by the

Full Faith and Credit Act:

> . . . [W]e find [the plaintiffs'] argument unpersuasive [because] it assumes that courts may simply create exceptions to 28 U.S.C. § 1738 whenever courts deem them appropriate.  Even conceding, *arguendo,* the laudable policy goal of making federal forums available to deserving litigants, we have expressly rejected [the plaintiffs'] view.  "Such a fundamental departure from traditional rules of preclusion, enacted into federal law, can be justified only if plainly stated by Congress."  *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 485, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).  Our cases have therefore made plain that "an exception to § 1738 will not be recognized unless a later statute contains an express or implied partial repeal."  *Id.,* at 468 102 S.Ct. 1883 (citing *Allen,* 449 U.S., at 99, 101 S.Ct. 411).  Even when the plaintiff's resort to state court is involuntary and the federal interest in denying finality is robust, we have held that Congress "must 'clearly manifest' its intent to depart from § 1738."  456 U.S., at 477, 102 S.Ct. 1883.

> \* \* \* \*

> At base, [the plaintiffs'] claim amounts to little more than the concern that it is unfair to give preclusive effect to state-court proceedings that are not chosen, but are instead *required* in order to ripen federal takings claims.  Whatever the merits of that concern may be, we are not free to disregard the full faith and credit statute solely to preserve the availability of a federal forum.

545 U.S. at 344-45, 347, 125 S. Ct. at 2505, 2507.

These rulings defeat Plaintiffs' contention here that they could (and did) preserve

their right to pursue their § 1983 claims before this Court by somehow limiting their

participation in the state probate court proceedings and declining to litigate issues that

might bear upon their federal claims or ability to recover in federal court.[19]  Just as the

plaintiffs in San Remo Hotel were compelled by ripeness principles to seek adequate

compensation in state court before pursuing § 1983 claims in their preferred federal

forum, Plaintiffs in this case also were compelled, by virtue of this Court's application of

abstention principles and imposition of a stay, to seek any available redress in the state

probate court proceedings before returning to this Court and resuming their quest for

relief under § 1983.[20]  As demonstrated by the decisions in Allen and San Remo Hotel,

---

[19]The Court assumes, for present purposes, that this is a fair characterization of Plaintiffs' chosen litigation strategies in the state court proceedings.  This appears to be a dubious assumption, at least in some cases — it is difficult to see, for example, how the two-day bench trial in the Jacob Schwartzkopf proceedings could be viewed as Cindy Schwartzkopf's "refusal" to litigate the issue of the MCDSCS's alleged misappropriation from Plaintiff Schwartzkopf's estate in its role as conservator.  The Court need not resolve this matter here, but instead returns to it below.

[20]The Court recognizes that Plaintiffs strongly disagree with its decision to abstain in these two cases pending the resolution of the state court proceedings.  Indeed, large portions of Plaintiffs' responses to Defendants' summary judgment motions are devoted to this subject, with Plaintiffs advancing various reasons why, in their view, this Court is obligated to exercise jurisdiction over the federal claims asserted in their complaints despite the existence of concurrent state court proceedings.

In its prior opinions in these cases, the Court has extensively discussed and explained its reasons for its decision to abstain.  Notwithstanding Plaintiffs' continued and rather heated arguments on this point, the Court finds no basis, factual or legal, to revisit this decision.  Indeed, in the Court's view, the state probate court's thorough and comprehensive handling of the surcharge proceedings — in which, as discussed below, Plaintiffs or their representatives were given every opportunity to raise factual and legal challenges, each of which was fully addressed and resolved by the court — fully vindicates this Court's prudential approach.  The fact that Plaintiffs may not agree with certain of the state court's findings does not itself provide a basis to attack or revisit its decisions in this Court.

Yet, regardless of Plaintiffs' evident disagreement with this Court's abstention decision, the Court is at a loss to see how such arguments have any bearing upon the issues implicated by Defendants' present motions.  Since all relevant state court proceedings apparently have

the involuntariness of Plaintiffs' participation in the state court proceedings has no

bearing upon the preclusive effect of the state court's rulings. Nor does it matter that the

state probate court might have reached and resolved issues that Plaintiffs would have

preferred this Court (or a federal jury) to decide in the first instance. Rather, the pertinent

question here, as in San Remo Hotel, is "whether the state court actually decided an issue

of fact or law that was necessary to its judgment," and that in turn is legally relevant to

Plaintiffs' ability to recover under federal law. San Remo Hotel, 545 U.S. at 342, 344,

125 S. Ct. at 2504-05.

**2.      The State Court's Rulings Preclude Plaintiffs from Relitigating the Issue of Defendants' Alleged Misappropriation of Their Property.**

Having addressed this threshold challenge to Defendants' proposed application of

preclusion principles, the Court turns to the Michigan law of issue preclusion. The

Michigan Supreme Court has explained that there generally are three prerequisites to the

application of this doctrine:

> (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel.

Monat v. State Farm Insurance Co., 469 Mich. 679, 677 N.W.2d 843, 845-46 (2004)

(internal quotation marks, alterations, footnotes, and citation omitted); see also Evans v.

---

concluded, the predicate for this Court's abstention ruling no longer exists, and Defendants no longer seek such relief. Rather, the Court is now called upon to determine the effect, if any, of the rulings in the now-final state court proceedings upon the continuing viability of Plaintiffs' § 1983 claims in this suit.

Pearson Enterprises, Inc., 434 F.3d 839, 849 (6th Cir. 2006).  Monat further holds, however, that "mutuality is not required" in cases where issue preclusion "is being asserted defensively against a party who has already had a full and fair opportunity to litigate the issue."  Monat, 677  N.W.2d at 852; see also Evans, 434 F.3d at 849 n.4.  It also bears emphasis, and the case law confirms, that these same preclusion standards and principles apply with full force to the determinations of Michigan probate courts.  See, e.g., Humphrey v. Detroit Bank & Trust Co. (In re Estate of Humphrey), 141 Mich. App. 412, 367 N.W.2d 873, 881 (1985); Evans, 434 F.3d at 849-50.

In determining the issue-preclusive effect of the Michigan probate court rulings here, the Court finds it helpful to draw a distinction among the four sets of proceedings in which the state courts addressed allegations of wrongdoing in the MCDSCS's handling of Plaintiffs' conservatorships.  In two of these proceedings, involving Plaintiffs Martha Pridemore and Jacob Schwartzkopf, the state probate court determined that the conservatorships had suffered no losses as a result of the MCDSCS's actions as conservator.  In the remaining two proceedings, involving Plaintiffs Lawrence J. Kawecki and Helen Alton, the state court entered orders for surcharge and directed Macomb County or the MCDSCS to make payments to Plaintiffs' estates.

> ### a.    The Proceedings on Behalf of Plaintiffs Pridemore and Schwartzkopf

Turning first to the two proceedings in which the state probate court declined to charge the MCDSCS with liability for its actions as conservator, the Court finds that the

resulting orders entered in these proceedings are entitled to preclusive effect in the

corresponding federal § 1983 suits, such that Plaintiffs Pridemore and Schwartzkopf are

precluded from relitigating the issue of the MCDSCS's alleged misappropriation of assets

from their respective conservatorships. As to the first prong of the test for issue

preclusion, the state court's final orders in the two proceedings clearly and expressly

reflect its factual finding in each case that the MCDSCS had not engaged in any

misconduct or wrongdoing in its role as conservator. It also is clear that these factual

findings were necessary to the state court's final orders in the two proceedings, where the

very purpose of the proceedings was to determine whether the MCDSCS should be

surcharged and ordered to reimburse the estates of Plaintiffs Pridemore and Schwartzkopf

for any losses resulting from the agency's misconduct. Thus, the Court readily concludes

that the issue of the MCDSCS's alleged wrongdoing as conservator was actually litigated

and necessarily determined in the state court surcharge proceedings involving the

Pridemore and Schwartzkopf conservatorships.

The Court further concludes that Plaintiffs Pridemore and Schwartzkopf, either

directly or through their representatives, had a full and fair opportunity to litigate this

issue in the course of the state probate court proceedings. To confirm that this is so, one

need look no further than the proceedings involving Plaintiff Jacob Schwartzkopf. In

those proceedings, Cindy Schwartzkopf — the very same individual who is named as the

personal representative of Mr. Schwartzkopf in this federal suit — filed a number of

objections on behalf of Mr. Schwartzkopf, alleging that various assets were either

misappropriated from his estate or improperly accounted for during the time that the MCDSCS served as conservator. Following a period of discovery and a two-day trial, the state probate court found that Ms. Schwartzkopf had failed to prove her allegations that the MCDSCS had mishandled or misappropriated any estate assets.

This record belies Plaintiffs' contention, repeated several times in their responses to Defendants' motions, that the state court surcharge proceedings were "*ex parte,* non-adversarial, non-judicial administrative type proceedings." (See, e.g., Plaintiffs' 4/17/2007 Response Br. at 1.) Plainly, Ms. Schwartzkopf was afforded, and took advantage of, the opportunity to (i) raise allegations that were directly contrary to the findings of the special fiduciary, (ii) pursue these allegations in discovery, and (iii) seek to persuade the probate court, in the course of a two-day adversarial trial, to accept her view of the evidence over the position advanced by the special fiduciary. Plaintiffs do not suggest how these proceedings might have failed to provide the requisite "full and fair opportunity" to litigate the issue of the MCDSCS's alleged misfeasance, nor have they identified any additional avenues for litigating this issue that were denied to Ms. Schwartzkopf in the state court proceedings.[21] To the contrary, in a motion filed with this

_____

[21]Indeed, on this crucial point, the heat of Plaintiffs' arguments far exceeds the light they shed on their view of the facts or law. As noted earlier, Plaintiffs' submissions in response to Defendants' motions are largely bereft of any discussion of the means that were or were not available in the state court proceedings for litigating challenges to the MCDSCS's conduct as conservator. Rather, Plaintiffs offer only sweeping (and unsupported) assertions about the "*ex parte*, non-adversarial [and] non-judicial" nature of surcharge proceedings, as well as the contention, addressed earlier, that they blunted any preclusive impact of the state court proceedings by "refus[ing] to litigate" the issues that they wished to preserve for their federal suits. Notably, in advancing this latter proposition, Plaintiffs refer solely to the Kawecki

Court seeking a stay of the state court proceedings, Ms. Schwartzkopf argued that such a stay was necessary to prevent her from being "forced to litigate Mr. Schwartzkopf's constitutional claims in Macomb Probate Court," with the result that "the doctrine of *res judicata* will bar those claims from being litigated in the federal court proceedings." (7/31/2006 Emergency Motion to Stay Proceedings, Br. in Support at 7.) Surely, if the state court proceedings provided a sufficient litigation opportunity to trigger the broad doctrine of claim preclusion, see Adair v. State of Michigan, 470 Mich. 105, 680 N.W.2d 386, 396 (2004) (observing that under Michigan's "broad approach," the doctrine of *res judicata* "bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not"), they necessarily afforded a full and fair opportunity to litigate an issue that Ms. Schwartzkopf squarely raised and actively pursued in those proceedings.

To be sure, no such objections were raised, and no trial was convened, in the state court proceedings addressing the estate of Plaintiff Martha Pridemore. Yet, as amply illustrated by the Schwartzkopf proceedings, there plainly was no lack of ***opportunity*** to present objections to the successor conservator's determination that the MCDSCS had not engaged in any wrongdoing in its role as conservator of Plaintiff Pridemore's estate. Nor do Plaintiffs contend otherwise in their responses to Defendants' motions. (See Plaintiffs' 4/17/2007 Response Br. at 14 n.16 (urging that in light of Plaintiffs' purported

---

proceedings, and nowhere do they suggest how the record could be viewed as reflecting Ms. Schwartzkopf's "refusal to litigate" the issue of the MCDSCS's misconduct.

"refus[al] to litigate" the issue of the MCDSCS's alleged misappropriation of their assets, it is "unnecessary to determine whether they had a full and fair opportunity to do so").) Under Michigan law, this opportunity to litigate an issue presented for the probate court's resolution, whether or not a party takes advantage of it, is sufficient to confer preclusive effect upon the court's subsequent determination of the issue. See, e.g., In re Estate of Humphrey, 367 N.W.2d at 881-82; James v. Gerber Products Co., 587 F.2d 324, 328 (6th Cir. 1978); McMahon v. Prudential Insurance Co., No. 06-15418, 2007 WL 2463343, at *2 (E.D. Mich. Aug. 30, 2007).

Plaintiffs insist, however, that the requisite mutuality of estoppel is lacking here because Defendants Mary Nelson-Pulice and Naomi Mial were not parties to the state court proceedings. As Defendants correctly observe, however, and as noted earlier, the Michigan courts do not insist upon mutuality of estoppel where, as here, the doctrine of issue preclusion "is being asserted defensively against a party who has already had a full and fair opportunity to litigate the issue." Monat, 677 N.W.2d at 852; see also Evans, 434 F.3d at 849 n.4. So long as Plaintiffs, whether directly or through their representatives, had the opportunity to litigate the issue of the MCDSCS's alleged misappropriation of assets from their conservatorships, the absence of one or more defendants as parties to the state court proceedings does not diminish the preclusive effect of those proceedings upon Plaintiffs' § 1983 claims in this Court. Consequently, because all of the necessary elements of issue preclusion are satisfied as to Plaintiffs Pridemore and Schwartzkopf, they are precluded from relitigating before this Court the issue that

was decided against them in the state probate court proceedings — namely, whether the MCDSCS misappropriated their assets in its role as court-appointed conservator.

Moreover, because these state court determinations cannot be revisited in the present action, it follows that Plaintiffs Pridemore and Schwartzkopf cannot prevail in their federal § 1983 claims against the MCDSCS and its agents, Defendants Nelson-Pulice and Mial. As revealed by the complaints in each of the two suits before this Court, a central (and essential) element of Plaintiffs' § 1983 claims is the allegation that the MCDSCS, acting through its employees Nelson-Pulice and Mial, "misappropriate[d] and/or convert[ed] for improper use funds belonging to [Plaintiffs], in violation of their rights as guaranteed by the Fourteenth Amendment to the Constitution of the United States." (Complaint in Case No. 05-73498 at ¶ 18; see also Complaint in Case No. 04-70907 at ¶ 16.) Absent any such misappropriation, Plaintiffs Pridemore and Schwartzkopf cannot establish the federal constitutional violation identified in their complaint — a violation predicated solely upon their right not to be deprived of their property by Defendants acting under color of state law. (See Complaint in Case No. 05-73498, Count I at ¶¶ 2-4.) By virtue of the state court's rulings, Plaintiffs are foreclosed from showing that any such property deprivation occurred.[22]

---

[22]The Court recognizes, of course, that the state court rulings were directed solely at the actions of the MCDSCS, and did not purport to separately address whether individual Defendants Nelson-Pulice or Mial had misappropriated Plaintiffs' property or engaged in any other sort of misconduct. Yet, it is clear from Plaintiffs' complaints in the two federal suits that their theory of liability as to the MCDSCS rests *exclusively* upon the alleged wrongdoing of agency employees Nelson-Pulice and Mial, who allegedly were acting at all relevant times within the scope of their employment. There is no suggestion in Plaintiffs' complaints or other

To be sure, Plaintiffs make much of the different standards for establishing a federal constitutional violation and for recovering under state law. They observe, for example, that a federal constitutional claim entails a showing of "intentional and deliberate" misconduct, while an "ordinary breach of fiduciary duty — such as negligence in taking care of the account or making ill-advised investments — does not amount to a violation of the protected person[']s[] federal constitutional rights and can only be redressed under state law." (Plaintiffs' 4/17/2007 Response Br. at 3 n.2.) Yet, under any such theory of recovery, whether founded upon state or federal law, Plaintiffs still must identify a loss that they suffered as a result of Defendants' actions, and the state court has determined that no such property loss occurred.[23] Accordingly, Defendants are entitled to summary judgment in their favor on the § 1983 claims asserted by Plaintiffs Pridemore and Schwartzkopf.

### b.    The Proceedings on Behalf of Plaintiffs Kawecki and Alton

Applying this same preclusion analysis with regard to the state probate court proceedings involving Plaintiffs Lawrence J. Kawecki and Helen Alton, the Court reaches

---

submissions that their claims against Defendants Nelson-Pulice and Mial rest upon anything other than the actions they took pursuant to the MCDSCS's role as court-appointed conservator. Consequently, the rulings in the MCDSCS's favor in the Pridemore and Schwartzkopf proceedings necessarily preclude Plaintiffs from relitigating the question whether Defendants Nelson-Pulice or Mial misappropriated assets from their conservatorships.

[23]Indeed, it is especially difficult in this case to see how Plaintiffs might benefit from the different standards under state and federal law, where the latter (as Plaintiffs acknowledge) requires a heightened showing of intentional misconduct rather than mere negligence. The state probate court, in contrast, could have imposed a surcharge upon the MCDSCS for any sort of property loss, whether due to intentional or negligent conduct.

much the same conclusion.  Under the first prong of the Michigan standard for issue

preclusion, the Court must inquire whether a "question of fact essential to the judgment"

was "actually litigated and determined by a valid and final judgment" in the state court

proceedings.  Monat, 677 N.W.2d at 845 (internal quotation marks and citation omitted).

In its final order in the Kawecki proceedings, the state probate court (i) reaffirmed its

earlier order approving the settlement reached between the MCDSCS and the special

fiduciary regarding the amount that the MCDSCS was to pay to Plaintiff Kawecki's

estate, (ii) overruled the objections lodged on Mr. Kawecki's behalf as to the adequacy of

this settlement, and (iii) stated that "based upon the evidence adduced at the previous

approval hearing," the amount to be paid by the MCDSCS "appear[ed] to be a complete

replacement of any sums allegedly missing" from Mr. Kawecki's estate.  (6/15/2005

Order at 1-2.)  The final order in the Alton proceedings, in contrast, incorporated the

stipulation of the parties — including Plaintiff Alton's personal representative, Ted

Birkholz, who also is identified as the personal representative of Ms. Alton's estate in the

complaint filed with this Court — that the special fiduciary had "documented

questionable actions and disbursements by MCDSCS and its agents in their capacity as

prior Conservator," and approved the parties' agreement that the MCDSCS would pay a

surcharge of $2,500 to Ms. Alton's estate.  (8/10/2005 Stipulation and Order for

Surcharge.)

In both cases, then, the state probate court was presented with a special fiduciary's

report of misconduct committed by the MCDSCS in its role as conservator, as well as a

proposed settlement reached by the special fiduciary and the MCDSCS calling for the latter to be surcharged and to pay a specified amount to the relevant estate. In both cases, moreover, the state court entered an order approving the proposed settlement. In the Kawecki proceedings, this order was entered only after the court heard and overruled objections to the adequacy of the proposed settlement. In the Alton proceedings, in contrast, no such objections were raised, with Ms. Alton's representative instead stipulating to the court's entry of an order approving the settlement.

Despite these procedural differences, the state court's orders in the two proceedings reflect its determination of a common issue — namely, that the amounts to be paid by the MCDSCS were appropriate and adequate compensation for the harm it had caused as court-appointed conservator. This determination was essential to the court's judgment in each case, because the court otherwise could not have properly approved the settlement proposed by the special fiduciary. Moreover, this issue was actually litigated in each case, to the full extent that any party sought to do so — objections were raised on behalf of Plaintiff Kawecki, while Plaintiff Alton's representative elected to consent to the proposed settlement. As to this issue, then, the first prong of the test for issue preclusion is satisfied.

Next, it is clear that Plaintiffs Kawecki and Alton, through their representatives, had a full and fair opportunity to litigate this issue in the course of the state probate court proceedings. This opportunity is especially evident in the Kawecki proceedings, where objections were filed on behalf of Plaintiff Kawecki's estate by one of the very same

attorneys, Annette Baker, who is representing Plaintiff before this Court.  As recounted at length earlier in this opinion, (see supra at 7-12), the state probate court then addressed these objections, along with other matters, at three separate hearings, affording counsel for Plaintiff Kawecki's estate ample opportunity to identify additional assets that were misappropriated or unaccounted for during the period that the MCDSCS acted as conservator, and to present any desired evidence in support of the objection that the settlement proposed by the special fiduciary rested upon an inadequate valuation of the personal property that had been lost or misappropriated by the MCDSCS.

As observed earlier, (see supra at 7-8), Plaintiff's attorney indicated at one of these hearings that all of the assets belonging to Plaintiff had been located and successfully retrieved by the special fiduciary, and that she no longer wished to pursue her objection regarding the proper valuation of Plaintiff's personal property.  Although counsel then sought to revive these objections at a subsequent hearing, the probate court declined to revisit these matters, reasoning that counsel had been given sufficient opportunity to pursue any challenges to the proposed settlement, that she had abandoned these challenges at a prior hearing, and that, in any event, she had declined the court's latest invitation to offer additional information or evidence bearing upon the adequacy of the proposed settlement.  At the conclusion of this final hearing, the court entered its June 15, 2005 order, finding that Plaintiff's heirs had failed to produce any evidence that the proposed settlement was "in any[] way inadequate," but that, to the contrary, the evidence adduced at the various hearings indicated that the settlement represented "a complete

replacement of any sums allegedly missing" from Plaintiff's estate.  (6/15/2005 Order at 1-2.)

Regardless of whether Plaintiff Kawecki's representative, heirs, or counsel might agree or disagree with the probate court's rulings on these points — and, as noted above, there is no record of a state court appeal from these rulings — this Court readily concludes that a full and fair opportunity was provided to litigate their objections to the settlement proposed by the special fiduciary.  While Plaintiff suggests various distinctions between the process for litigating these matters in probate court and the procedures that would have been available in this Court — Plaintiff repeats, for example, his oft-stated assertion that he was "not a party" to the state court proceedings, despite his counsel's appearance in those proceedings and counsel's evident opportunity to file papers and present objections, evidence, and arguments — he fails to identify any authority for the proposition that objecting parties in Michigan probate court proceedings lack the requisite "full and fair" litigation opportunity that triggers issue preclusion.  And, once again, one need only look to the Schwartzkopf proceedings to confirm that the probate court provides a forum for vigorously litigating such objections.  In that case, the court granted a period of discovery and convened a two-day trial in response to objections to the special fiduciary's finding of no wrongdoing by the MCDSCS.  Presumably, then, if Plaintiff Kawecki's counsel had continued to pursue her objections, rather than abandoning them, and had identified a need for further discovery in order to support these objections, a similar opportunity would have been provided to litigate these matters more extensively.

As explained earlier, this opportunity suffices to confer preclusive effect upon the state court's rulings.

The same can be said about the state court's rulings in the Alton proceedings. No objections were filed or litigated in that case, because Plaintiff's representative in the federal suit and the state proceedings alike, Ted Birkholz, stipulated to the entry of an order calling for the MCDSCS to pay $2,500 to Ms. Alton's estate. Yet, there is no claim that Plaintiff's representative was impeded in any way from raising objections to the settlement proposed by the special fiduciary, nor has Mr. Birkholz identified any avenues for litigating this issue that he wished to pursue but could not.[24] Accordingly, the "full and fair opportunity" prong of the test for issue preclusion is satisfied as to Plaintiffs Kawecki and Alton alike. Moreover, because the "mutuality" prong of this standard is inapplicable here, in light of the defensive use of issue preclusion against Plaintiffs Kawecki and Alton, the Court finds that these two parties are bound by the state probate court's determination that the surcharge amounts proposed by the special fiduciaries in the Kawecki and Alton proceedings were appropriate to reimburse Plaintiffs' estates for the losses they suffered during the period that the MCDSCS served as conservator.

The Court further concludes, as it did earlier with respect to the claims asserted by Plaintiffs Pridemore and Schwartzkopf, that the issue-preclusive effect of the state court

_____

[24]The Court notes that while Michigan law generally does not give issue-preclusive effect to a consent judgment of the sort entered in the Alton proceedings, such a judgment can be deemed to preclude relitigation of an issue of fact if the parties' settlement reflects their intention to be bound by their resolution of this issue. See American Mutual Liability Insurance Co. v. Michigan Mutual Liability Co., 64 Mich. App. 315, 235 N.W.2d 769, 776 & n.13 (1975).

rulings in the Kawecki and Alton proceedings forecloses these two parties from obtaining any additional relief under § 1983. As explained above, Plaintiffs' § 1983 claims rise or fall upon the allegation that the MCDSCS, through its agents Naomi Mial and Mary Nelson-Pulice, misappropriated their assets in its role as court-appointed conservator. Through its rulings in the Kawecki and Alton proceedings, the state probate court determined the precise extent of this misappropriation, and Plaintiffs were afforded a full and fair opportunity to identify any deficiencies in the special fiduciary's investigation and to challenge any inadequacies in the surcharges proposed by the special fiduciary. Under Michigan's law of issue preclusion, Plaintiffs Kawecki and Alton are not entitled to a second opportunity to litigate the extent of the losses inflicted upon their estates by the MCDSCS in its role as conservator.[25]

Indeed, Plaintiffs expressly acknowledge that the state court's judgments in the Kawecki and Alton proceedings serve to *diminish,* at least, the awards of compensatory damages that they may seek before this Court. In particular, they state in their response to Defendants' motion that "insofar as [the state court proceedings] resulted in a sum of money being returned to the [Plaintiffs'] estates, this will operate to **reduce** the compensatory damages that can be awarded against the defendants for a violation of the plaintiffs' federal constitutional rights." (Plaintiffs' 4/17/2007 Response at 13 (emphasis

---

[25]Moreover, and for the same reasons stated earlier with respect to Plaintiffs Pridemore and Schwartzkopf, the issue-preclusive effect of the state court's rulings as to the MCDSCS carries over to Plaintiffs' claims against Defendants Mial and Nelson-Pulice, despite the absence of these individuals as parties to the state court proceedings.

in original) (footnote omitted).)  Plainly, then, if the surcharge amounts determined in the state court proceedings reflected the ***entirety*** of the harm caused by the MCDSCS, no further recovery of compensatory damages would be permitted in this Court.  This is true regardless of (i) how many laws the MCDSCS or its agents might have violated in inflicting this harm, (ii) whether one or more of these violations might be governed by federal law, and (iii) whether the state court might have failed to reach or resolve one or more of the elements of a potential federal-law theory of recovery.[26]

Yet, the ***whole point*** of the state court surcharge proceedings was to determine the extent of the losses suffered by Plaintiffs' estates as a result of the MCDSCS's breaches of its duties as conservator.  As Plaintiffs recognize, the relevant state-law standards applied by the probate court sweep more broadly than the federal standards that govern Plaintiffs' § 1983 claims, because the MCDSCS was subject to surcharge for negligence and intentional misconduct alike.  Under these circumstances, where the probate court charged the special fiduciaries with the task of determining the full extent of the MCDSCS's misappropriation or mishandling of Plaintiffs' assets, and where Plaintiffs were given the opportunity to identify additional losses suffered by their estates during the period when the MCDSCS served as conservator, this Court fails to see how the surcharges imposed by the probate court could be viewed as anything other than the state

---

[26]As Plaintiffs point out in their responses to Defendants' motions, the relief they seek under § 1983 includes punitive damages that were not available in the state court proceedings. The legal significance of this is addressed below.

court's determination of the totality of the losses sustained by Plaintiffs' estates.

Certainly, Plaintiffs have not suggested how this Court could properly "reduce," but not

altogether eliminate, the amounts of compensatory damages available to them here,

absent relitigation of the entire universe of issues addressed in the state court proceedings.

This, however, is precisely what the Full Faith and Credit Act prohibits, so long as the

state court's rulings would be entitled to preclusive effect in a Michigan court.  Because

all of the applicable elements of issue preclusion are satisfied, as least as to the issue of

the extent of the harm inflicted upon Plaintiffs' estates by the MCDSCS and its agents,

the Court finds that Plaintiffs Kawecki and Alton are foreclosed from seeking an

additional recovery of compensatory damages under § 1983 for the very same injuries

that were identified and redressed in the state court proceedings.[27]

Beyond this conclusion reached under the Full Faith and Credit Act and

Michigan's law of issue preclusion, there is an additional principle of federal law, as

---

[27]In light of this conclusion grounded in the law of issue preclusion, the Court need not address Defendants' broader contention that Plaintiffs' § 1983 claims are foreclosed under *res judicata* principles.  To be sure, while Plaintiffs repeatedly assert that they could not have pursued their federal constitutional claims in the state probate court, they have never cited any authority for this proposition, much less addressed the apparently contrary case law cited in this Court's prior opinions.  See, e.g., Manning v. Amerman, 229 Mich. App. 608, 582 N.W.2d 539, 541-42 (1998); see also Was v. Plante, 2006 WL 1713933, at *4 (Mich. Ct. App. June 22, 2006). Neither have Plaintiffs identified any instance in any of the four state court proceedings where any one of them attempted to raise his or her federal constitutional claims but was denied the opportunity to do so.  To the contrary, Plaintiff Kawecki's counsel, at least, vigorously opposed any effort to address any such federal claims in the state court proceedings.  Nonetheless, it is unnecessary in these cases to determine what effect this strategy of avoidance might have upon the application of *res judicata*.  Nor is there any need for this Court to decide whether the jurisdictional reach of the Michigan probate courts extends to the federal constitutional claims of objecting parties.

recognized by the Sixth Circuit on more than one occasion, that precludes any further recovery of compensatory or punitive damages under § 1983. In Campbell v. City of Allen Park, 829 F.2d 576 (6th Cir. 1987), plaintiffs Debra and Dale Campbell brought a federal § 1983 suit against Ms. Campbell's former employer, the City of Allen Park, alleging that the city had violated their federal constitutional rights to equal protection and substantive due process by refusing to waive its requirement that its employees live in Allen Park. While this federal suit was pending, Ms. Campbell received a favorable decision from a state court, which ordered her reinstatement with back pay. In light of this state court ruling, the Sixth Circuit raised *sua sponte* the issue whether the Campbells were "entitled to proceed with their federal court action after Mrs. Campbell had been reinstated with back pay." Campbell, 829 F.2d at 578-79.

The court held that they were not. In so ruling, the court first acknowledged that "the legal theory advanced by the plaintiffs here differs from their theory in the state court proceeding." 829 F.2d at 580. The court further observed that it was open to question whether the Campbells could have asserted their federal constitutional claims in the state court proceedings. Nonetheless, the court, guided principally by the Ninth Circuit's decision under similar facts in Punton v. City of Seattle, 805 F.2d 1378 (9th Cir. 1986), reasoned that the Campbells' federal claims were moot in light of the relief they had obtained in state court:

> . . . [I]t is indisputable that a major part of the relief sought in the
> Campbells' federal action — reinstatement with back pay — had already
> been achieved by the time the federal action came on for decision . . . .  [I]n

44

both [the present suit and *Punton*] . . . , the federal case had become moot, in effect, except insofar as the claims for attorney fees and damages for emotional distress might have remained viable. It seems to us that the result reached in *Punton* supports the conclusion that once Mrs. Campbell had been restored to her employment with an award of back pay, she was no longer free to pursue her federal claim even though she had not received attorney fees and damages for emotional distress.

Under Article III of the United States Constitution, federal courts sit to decide live, current controversies, and not to pontificate on constitutional questions that have become academic as far as the litigants are concerned. The constitutionality of Mrs. Campbell's discharge became moot once she was restored to her job with a judgment for back pay, unless the claim for additional monetary damages kept the constitutional issue alive. In light of *Punton,* we doubt that it did.

Campbell, 829 F.2d at 580.

While this ruling is phrased in somewhat tentative language, the Sixth Circuit has

since reaffirmed that a federal § 1983 claim is barred by mootness principles once a

plaintiff's injuries are adequately redressed in a parallel state court proceeding. In WJW-

TV, Inc. v. City of Cleveland, 878 F.2d 906 (6th Cir. 1989), for example, a local

television station brought a federal suit challenging its exclusion from a meeting

convened by the Cleveland city council and the city's mayor. The TV station alleged that

this meeting was held in violation of the First Amendment, and that it also violated an

Ohio "sunshine" law and an open meeting provision in the Cleveland city charter. The

district court granted summary judgment in favor of the TV station, holding that the First

Amendment mandated that all city council meetings be open to the press and public

unless the council made specific findings that a substantial governmental interest would

be served by closing a particular meeting. While the city's appeal from this decision was

pending, the Ohio Supreme Court ruled in a case arising from the same facts, holding that the meeting in question violated the open meeting provision in the city charter.

In light of this intervening state court decision, the Sixth Circuit dismissed the federal case as moot. As in <u>Campbell</u>, the court recognized that the state court's ruling rested upon state law, while the federal district court's decision was predicated upon federal First Amendment principles. <u>See</u> <u>WJW-TV</u>, 878 F.2d at 910. The court also acknowledged a "disparity between the parties in the instant action and the parties in" the state court suit, which had been brought by a local newspaper. 878 F.2d at 910. Nonetheless, in determining that the federal case was moot, the court cited the "general principle in cases involving a constitutional challenge" that courts should "avoid a determination that a particular activity is unconstitutional if the viable issues in the case may be disposed of on some other reasonable basis." 878 F.2d at 910 (internal quotation marks, alterations, footnote, and citation omitted). In light of the "resolution of [the] identical controvers[y] by the Ohio Supreme Court pursuant to state and municipal law," the court found that there was no longer any "necessity for an appella[te] review by this court to decide the federal constitutional question." 878 F.2d at 910.

The Sixth Circuit reached the same conclusion in <u>Braley v. City of Pontiac</u>, 906 F.2d 220 (6th Cir. 1990), a case in which plaintiff Norman Braley asserted federal § 1983 claims and various state-law claims arising from an encounter with City of Pontiac police officers. After the district court dismissed Braley's state-law claims without prejudice, he reasserted them in state court and obtained a judgment in his favor against one of the

46

three Pontiac police officers named in his state and federal complaints.  In light of this

relief awarded in the state court proceeding, the district court dismissed Braley's federal

claims, and the Sixth Circuit affirmed:

> It is well established that an action brought under § 1983 is
> supplemental to a common law action arising out of the same factual
> circumstances.  Thus, a plaintiff may generally pursue remedies under the
> tort law and under § 1983 simultaneously.  The general doctrine of the
> supplemental nature of § 1983, however, does not mean that a plaintiff who
> makes out a constitutional claim will get two vindications of that claim.  A
> supplemental § 1983 action is available where it seeks to vindicate a
> constitutional right that was not adequately vindicated by the state law
> action.

> In this case, appellant claims that his constitutional rights were
> violated by the police officers when they falsely arrested and imprisoned
> him and maliciously prosecuted him.  Insofar as these claims state
> constitutional violations, the violations were addressed at the state trial and
> remedied by the award of $20,000.  Appellant does not raise on appeal any
> constitutional guarantees that were not vindicated through the state remedy.

> This case is similar to *Campbell v. City of Allen Park,* 829 F.2d 576
> (6th Cir. 1987).  The similarity lies in the fact that the plaintiff in *Campbell*
> obtained substantial satisfaction in state court of the claims on which her §
> 1983 action was based . . . .  This court . . . held, as an alternative ground
> for its decision, that the substantial remedy obtained by Campbell in the
> state court rendered the federal claim moot.

> We note that the recovery obtained by the appellant in the state court
> may not be identical to the recovery he could have obtained in federal court.
> Appellant attempts to distinguish his state claims for false arrest, false
> imprisonment, and malicious prosecution from his § 1983 constitutional
> claim on the ground that § 1983 entitles him to seek punitive damages that
> were not available to him in the state action.  That argument does not work.
> A difference in the amount of damages available to a plaintiff under § 1983
> and those available under state law does not justify a separate § 1983 action.

Braley, 906 F.2d at 223-24 (citations omitted).

This line of Sixth Circuit precedent provides an additional ground for granting summary judgment in Defendants' favor on the § 1983 claims brought by Plaintiffs Kawecki and Alton. As a result of the judgments in the parallel state court proceedings, each of their estates has been fully compensated for the losses caused by the MCDSCS's breaches of its state-law duties as conservator. As Plaintiffs concede, these duties sweep more broadly than the corresponding duties owed under federal constitutional law, since the MCDSCS was obligated under state law to reimburse Plaintiffs' estates for losses that were attributable to the agency's mere negligence as well as its intentional wrongdoing. Moreover, the Court already has observed that Plaintiffs had a full and fair opportunity to litigate the extent of the harm that the MCDSCS caused to their estates in its role as conservator, such that the surcharges imposed by the state probate court fully redressed these injuries.

To be sure, the parties to the state and federal proceedings are not identical and the legal theories are different. Moreover, Plaintiffs repeatedly stress that punitive damages are available under § 1983, but could not be awarded in the state court proceedings. Yet, the Sixth Circuit's decisions in Campbell, WJW-TV, and Braley establish that these considerations do not save the § 1983 claims of Plaintiffs Kawecki and Alton from dismissal on mootness principles. Accordingly, and as an alternative to its ruling based on issue preclusion, the Court finds that the § 1983 claims brought by Plaintiffs Kawecki and Alton must be dismissed as moot, where the injuries they have alleged in their federal complaints have already been redressed by the surcharge awards in the state court

proceedings.

**C.    Plaintiffs Have Failed to Plead a Violation of Their Right to Substantive Due Process as Defined Under the Law of This and Other Circuits.**

While most of the arguments put forward in Defendants' motions rest upon principles of *res judicata* and collateral estoppel, Defendants contend in the alternative that the substantive due process theory advanced by Plaintiffs in this Court is at odds with the case law of this and other federal circuits.  Having reviewed the decisions cited by Defendants on this point, the Court agrees that they provide an additional basis for awarding summary judgment in Defendants' favor on Plaintiffs' § 1983 claims.

Although Plaintiffs' complaints are somewhat unclear on this point, their subsequent submissions confirm that their federal § 1983 claims rest exclusively upon Defendants' alleged violation of their right to substantive due process.  (See, e.g., Plaintiffs' 4/17/2007 Response Br. at 1-2 & n.1.)  As the Sixth Circuit has explained, the "substantive" component of the Fourteenth Amendment's Due Process Clause has been construed by the courts as mandating that "governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed."  Bowers v. City of Flint, 325 F.3d 758, 763 (6th Cir. 2003) (internal quotation marks and citation omitted).  One specific aspect of this substantive due process guarantee — and the one relied upon by Plaintiffs here, (see Plaintiffs' 4/17/2007 Response Br. at 2 & n.1) — is the right to be free of "executive abuse[s] of power" that "shock[] the conscience."  County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S. Ct. 1708, 1717 (1998); see also Bowers, 325 F.3d at 763.

In this case, Plaintiffs assert that Defendants engaged in "egregious,"

"outrageous," and conscience-shocking behavior by willfully and deliberately

misappropriating assets belonging to, and breaching fiduciary duties owed to, disabled

and "helpless people whom they were supposed to protect." (Plaintiffs' 4/17/2007

Response Br. at 2-3.) In Plaintiffs' view, Defendants' alleged misconduct is akin to

"police brutality and the deliberate use of undue force by law enforcement officers

against persons who are in their official custody," (id. at 3) — conduct which, at least

under some circumstances, has been held to constitute a substantive due process violation.

See, e.g., Wilson v. Beebe, 770 F.2d 578, 582 (6th Cir. 1985).[28]

The Sixth Circuit, however, has consistently rejected this proposed analogy,

declining on a number of occasions to extend the "shocks the conscience" standard to

cases that do not involve physical force. In Braley, for example, the court explained:

> Most cases alleging police conduct that shocks the conscience have
> involved allegations of excessive force or physical brutality. [Braley's]
> complaint, however, does not allege excessive force. Therefore, we must
> determine whether [Braley's] claims of false arrest, false imprisonment, and
> malicious prosecution support a claim of deprivation of his substantive due
> process rights.
>
> Essentially, Braley alleges that [the defendant officer's] misuse of

---

[28]As noted in Braley, supra, 906 F.2d at 225 n.5, the courts' treatment of police brutality as a potential substantive due process violation has been curtailed by the Supreme Court's decision in Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870-71 (1989), which holds that federal constitutional claims that implicate a specific constitutional provision must be analyzed under the legal standards that govern this particular provision. Because the parties have not suggested that Plaintiffs' allegations in these cases implicate a specific constitutional guarantee, it is appropriate to analyze Plaintiffs' claims under the "shocks the conscience" prong of the substantive due process doctrine.

the power represented by his police badge was behavior that would shock the conscience of a reasonable person. Applying the "shock the conscience" test in an area other than excessive force, however, is problematic. Not only are there fewer instances in the case law, but the "shock the conscience" test is not as uniformly applied to cases where excessive force or physical brutality is not the basis of the claim. The "shock the conscience" standard, fuzzy under the best of circumstances, becomes fuzzy beyond a court's power to interpret objectively where there is a dearth of previous decisions on which to base the standard. We doubt the utility of such a standard outside the realm of physical abuse, an area in which the consciences of judges are shocked with some degree of uniformity.

Braley, 906 F.2d at 226.

Similarly, in Mansfield Apartment Owners Ass'n v. City of Mansfield, 988 F.2d 1469, 1478 (6th Cir. 1993), the court deemed it inappropriate to apply the "shocks the conscience" standard to a federal constitutional claim challenging the defendant municipality's policy of refusing to reestablish water service to a rental unit until the delinquencies of a former tenant had been paid. Citing Braley, the court stated that it was "reluctant to apply the 'shock the conscience' standard," where "the present case does not concern physical abuse." Mansfield Apartment Owners, 988 F.2d at 1478. Upon declining to assess the defendant's actions under this standard, the court affirmed the grant of summary judgment in the city's favor on the plaintiffs' substantive due process claim. Mansfield Apartment Owners, 988 F.2d at 1478; see also Cassady v. Tackett, 938 F.2d 693, 698 (6th Cir. 1991) ("Since the present case, like Braley, does not concern physical abuse, we are reluctant to apply the 'shock the conscience' standard."); Choate's Air Conditioning & Heating, Inc. v. Light, Gas & Water Division of the City of Memphis,

16 F. App'x 323, 329 (6th Cir. June 22, 2001) ("While we have questioned the continued vitality of [the 'shocks the conscience'] strand of substantive due process jurisprudence, we nevertheless continue to recognize it in the exclusive context of cases involving physical abuse."); Wedgewood Limited Partnership I v. Township of Liberty, 456 F. Supp.2d 904, 933-34 n. 35 (S.D. Ohio 2006) (observing that the Sixth Circuit has limited its recognition of "shocks the conscience" substantive due process claims to "cases involving *physical abuse*"); Miller v. City of Columbus, 920 F. Supp. 807, 819 (S.D. Ohio 1996) (opining that governmental "interference with a property interest could never rise to th[e] level" required to satisfy the "shocks the conscience" standard).

To be sure, the Court shares Plaintiffs' view that the misconduct allegedly engaged in by Defendants here is deeply troubling, and might even be said to "shock the conscience" in a colloquial sense. As a moral and ethical matter, the Court is dismayed by the notion that government officials would abuse their position of authority by misappropriating property that was entrusted to them for safekeeping. Worse yet, the property belonged to individuals who could not look out for themselves, and thus were uniquely dependent upon these court-appointed officials to preserve their estates and act in their best interests. Nonetheless, in light of clear Sixth Circuit precedent declining to extend the "shocks the conscience" standard beyond cases involving physical abuse, this Court finds that the property deprivations alleged by Plaintiffs in the present cases cannot sustain their substantive due process claims.

The decisions of other circuits lend further support to this conclusion, albeit under

a different line of reasoning.  The starting point for this alternative approach to Plaintiffs'

substantive due process claims is the Supreme Court's pronouncement that "an

unauthorized intentional deprivation of property by a state employee does not constitute a

violation of the procedural requirements of the Due Process Clause of the Fourteenth

Amendment if a meaningful postdeprivation remedy for the loss is available."  Hudson v.

Palmer, 468 U.S. 517, 533, 104 S. Ct. 3194, 3204 (1984).  Plainly, this rule would defeat

any claim of a procedural due process violation in the present cases, because the state

probate court proceedings provided meaningful postdeprivation remedies for any

misappropriations of Plaintiffs' assets by the MCDSCS or its agents.  In apparent

recognition of this, Plaintiffs insist that their § 1983 claims are founded upon violations of

their right to **substantive**, and not procedural, due process.

Although the Sixth Circuit has not spoken definitively on this subject, other

circuits have been unwilling to allow the rule of Hudson to be circumvented through a

simple recasting of a claim as entailing a substantive rather than procedural due process

violation.  In Kauth v. Hartford Insurance Co., 852 F.2d 951 (7th Cir. 1988), for instance,

the Seventh Circuit addressed a claim that a deputy sheriff violated the plaintiff's rights to

procedural and substantive due process by seizing his property pursuant to a state court

order of attachment.  After determining that the plaintiff's procedural due process claim

was defeated by the availability of adequate post-deprivation remedies, the court then

turned to his substantive due process claim:

> Some circuits have interpreted recent cases such as [*Regents of the*

*University of Michigan v. Ewing,* 474 U.S. 214, 106 S. Ct. 507 (1985)] as an implication by the Supreme Court that state-created property interests can invoke substantive due process concerns. The Supreme Court, however, has not actually held that the mere deprivation of a property interest is sufficient to state a substantive due process claim. In *Ewing,* for example, a former medical student claimed that the University of Michigan arbitrarily refused to let him retake a crucial examination that he had failed. The Court did not decide whether Ewing had a cognizable substantive due process claim. Rather, the Court held that "even if Ewing's assumed property interest gave rise to a substantive due process right under the Due Process Clause to continued enrollment free from arbitrary state action, the facts of the record disclose no such action." 474 U.S. at 223, 106 S. Ct. at 512.

    The Fifth Circuit has recognized that if courts interpret *Ewing* to hold that the deprivation of a state-created property interest can support a substantive due process claim, that interpretation may effectively overrule established Supreme Court precedent on procedural due process, such as *Parratt [v. Taylor,* 451 U.S. 527, 101 S. Ct. 1908 (1981),] and *Hudson,* holding that due process is satisfied when adequate state remedies are available. If we were to find a cognizable substantive due process claim in the present case, we would encourage litigants to try to circumvent the holdings in *Parratt* and *Hudson* by characterizing their claims as implicating substantive, rather than procedural, due process.

    We have indicated in previous opinions that we do not believe that substantive due process protects state-created property rights. Other courts have agreed. Certainly, the Supreme Court has not yet decided this issue. Without the Court's guidance, we will not adopt a characterization of substantive due process that could effectively undermine established Supreme Court precedent requiring plaintiffs complaining of arbitrary deprivations of their property to seek redress through state remedies. We believe this result is in keeping with the Supreme Court's refusal to "'make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States.'" *Parratt,* 451 U.S. at 544, 101 S. Ct. at 1917 (quoting *Paul v. Davis,* 424 U.S. 693, 701, 96 S. Ct. 1155, 1160, 47 L.Ed.2d 405 (1976)).

    We have recognized that if substantive constitutional rights are violated, the constitutionally recognized deprivation is complete at the time of the action, irrespective of the procedures available before or after the

deprivation.  Given the Supreme Court's recent decisions in *Parratt* and *Hudson,* however, we believe that in cases where the plaintiff complains that he has been unreasonably deprived of a state-created property interest, without alleging a violation of some other substantive constitutional right or that the available state remedies are inadequate, the plaintiff has not stated a substantive due process claim.

Kauth, 852 F.2d at 957-58 (internal quotation marks and citations omitted).

Other courts have reached the same conclusion.  In Holloway v. Walker, 784 F.2d 1287 (5th Cir. 1986), the plaintiffs alleged that their opposition in a state court suit had conspired with the presiding state court judge to control the outcome of the suit, thereby depriving the plaintiffs of their property without due process of law.  After determining that the plaintiffs' procedural due process claim was defeated under the rule of Hudson and Parratt by the availability of an adequate post-deprivation remedy — namely, a state court appeal — the Fifth Circuit addressed (and rejected) the plaintiffs' claim of a substantive due process violation:

. . . [P]laintiffs argue that the "right to a fair trial" is a substantive due process right and that therefore *Parratt/Hudson* is inapplicable.  They argue . . . that a judicial conspiracy to deprive litigants of their property "shocks the conscience."

Assuming for the sake of this analysis that plaintiffs established a judicial conspiracy, the resultant shocked conscience cannot displace common sense.  That sense dictates that the right to an impartial judge is a matter of procedural, not substantive, due process.  To hold otherwise would be to fictionalize solely for the purpose of avoiding the application of *Parratt/Hudson* a situation to which *Parratt/Hudson* was clearly meant to apply, i.e., where a plaintiff is deprived of his property by the unexpected, unauthorized act of a state employee.  As the district court noted, the effect of accepting plaintiffs' argument would be to hold that although a person fails to state a due process claim by complaining that he was deprived of property without due process (under *Parratt/Hudson*), he nonetheless states

56

> a due process claim by complaining he was not provided due process while being deprived of his property. We cannot undermine *Parratt/Hudson* in this way.

Holloway, 784 F.2d at 1293-94 (citations omitted); see also DeKalb Stone, Inc. v. County

of DeKalb, 106 F.3d 956, 960 (11th Cir. 1997) (finding, in line with the court's

precedents, that the plaintiff could not state a substantive due process claim based upon

an alleged "executive violation of a state-created property right"); Archuleta v. Colorado

Department of Institutions, 936 F.2d 483, 490 (10th Cir. 1991) (declining to "decide the

difficult question of when, if ever, the existence of an adequate state procedure in which

the plaintiff could seek a remedy for the deprivation of his or her property precludes a

claim for substantive due process," but holding in the case before it that "because a

procedurally adequate post-termination hearing actually resulted in the plaintiff's

reinstatement . . . with back pay . . . , the plaintiff cannot now state a substantive due

process claim under § 1983 predicated on the loss of employment").

As noted, the Sixth Circuit has had little to say on this subject. In one case, in

which the plaintiff low bidder on a contract for insurance services sought to challenge the

State of Michigan's decision to rebid the contract, the Sixth Circuit held that the loss

claimed by the plaintiff could "easily be remedied in the Michigan courts," and that no

substantive due process claim was available "in this instance." United of Omaha Life

Insurance Co. v. Solomon, 960 F.2d 31, 35 (6th Cir. 1992). In addition, a district court in

this circuit has reasoned that to "allow[] a substantive due process claim for deprivation

of property where an adequate state remedy exists would effectively eviscerate the

holding of *Parratt*."  Miller, supra, 920 F. Supp. at 818.

This Court wholly concurs in the reasoning of these prior decisions, and finds it especially applicable under the circumstances of the present cases.  As explained earlier, each of the four Plaintiffs in these cases had a full and fair opportunity to litigate the issue of the MCDSCS's alleged misconduct before the state probate court.  If Plaintiffs sought to pursue procedural due process claims before this Court, the evident availability of an adequate state remedy surely would defeat such claims, as Plaintiffs seemingly realize.  Under these circumstances, where Plaintiffs' § 1983 claims rest exclusively upon the alleged deprivation of their property, and where the state probate court addressed this very question in proceedings in which Plaintiffs or their representatives had a thorough opportunity to participate and raise any desired challenges concerning the misappropriation or mismanagement of their property, the Court finds that a substantive due process theory of recovery is not available.[29]

---

[29]Apart from their federal § 1983 claims, Plaintiffs also have asserted state-law claims of fraud.  Having resolved all of the claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims asserted in Plaintiffs' complaints.  See 28 U.S.C. § 1367(c)(3).

# IV. **CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' March 6, 2007 renewed motion to dismiss and/or for summary judgment in Case No. 04-70907 is GRANTED, in accordance with the rulings in this opinion. IT IS FURTHER ORDERED that Defendants' March 6, 2007 renewed motion to dismiss and/or for summary judgment in Case No. 05-73498 is GRANTED, also in accordance with the rulings in this opinion. In light of these rulings, Defendants' April 3, 2006 motions to dismiss and/or for summary judgment in Case No. 04-70907 and Case No. 05-73498 are DENIED AS MOOT.

Next, in light of the grant of summary judgment in Defendants' favor, IT IS FURTHER ORDERED that Plaintiffs' January 20, 2006 and February 3, 2006 motions for class certification in Case No. 05-73498 are DENIED. For the same reason, Plaintiffs' November 10, 2006 motions to lift the stay on discovery in Case No. 04-70907 and Case No. 05-73498 also are DENIED.

Dated: January 24, 2008

s/Gerald E. Rosen_____
Gerald E. Rosen
United States District Judge

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 24, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager